# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 06-3915

_____

|  |  |  |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Western District of Missouri. |
| Shondell E. Ingram, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: May 18, 2007
Filed: September 6, 2007

_____

Before MURPHY, HANSEN, and COLLOTON, Circuit Judges.

_____

COLLOTON, Circuit Judge.

Shondell E. Ingram was convicted by a jury of unlawful possession of a firearm as a previously convicted felon. The district court[1] sentenced him to 262 months' imprisonment. Ingram appeals the conviction and sentence, and we affirm.

_____

[1]The Honorable Scott O. Wright, United States District Judge for the Western District of Missouri.

Ingram's conviction stems from the events of August 21, 2005, in Grandview, Missouri. Police reported to the Ridgeview Apartments, where three young women told them that Ingram had wrapped a handgun in a white t-shirt and put it in the back of a red Dodge pickup truck. An officer discovered a loaded .32-caliber handgun wrapped in a large white t-shirt in the truck bed. One of the women identified Ingram, who was in the area, and officers arrested him. Ingram was prohibited from possessing a firearm, having been convicted of armed robbery in 1991.

The prosecution presented testimony from several persons who resided at the Ridgeview Apartments. Angel Young and Christina Young, who are not related, lived together in one apartment with Christina's parents and Christina's younger sister, Ashley. Jennifer Zimmerman lived in another unit. Another witness, Jesse Dean, was the boyfriend of Ashley Young. At trial, Zimmerman, Angel, and Christina all testified that Ingram took the gun from his waistband, and placed it in the bed of the Dodge truck. Angel and Christina testified that Ingram wrapped the gun in a white t-shirt. Dean, Angel, and Ashley testified that they saw Ingram in possession of a handgun earlier in the day.

According to Dean and Ashley, Ingram was angry with Dean because he had refused to commit a robbery with Ingram. Dean testified that to express his anger, Ingram lifted his shirt to display a handgun concealed in his waistband, threatened to shoot through the door of the apartment where Dean was visiting Ashley, and threatened to kill Dean. When Dean looked outside, he saw Ingram pointing the weapon at the window.

Angel and Christina testified that later, when they were outside the apartment, they saw Ingram hiding in the hallway nearby. After that, Angel saw him in the parking lot near his car, putting bullets in the gun. Ingram called the women over and

told Angel that he would kill her if she "snitched" on him.  The women then ran to Jennifer Zimmerman's apartment.  Ingram followed them, but was refused entry.  Zimmerman then called the police, setting in motion the events that led to Ingram's arrest and prosecution.

## II.

Ingram first challenges the sufficiency of evidence to support his conviction.  He contends that the evidence failed to establish that he knowingly possessed the firearm.  When reviewing convictions for the sufficiency of the evidence, "we view the evidence in the light most favorable to the government, resolving evidentiary conflicts in favor of the government, and accepting all reasonable inferences drawn from the evidence that support the jury's verdict." *United States v. Garnica*, 477 F.3d 628, 630 (8th Cir. 2007) (per curiam) (internal quotation omitted).  We will reverse a conviction only if no reasonable jury could have found the defendant guilty beyond a reasonable doubt.  *Id.*

Ingram's challenge rests on apparent inconsistencies in the statements of his accusers.  Angel claimed to have seen three guns, Christina recalled only one gun, and Zimmerman told the 911 operator that there were five guns, based on information the other two women had given her.  Similarly, Ingram points to Zimmerman's apparently inaccurate statement of what t-shirt Ingram had been wearing, and inconsistencies as to whether an additional witness named "Daniel" was present in Zimmerman's apartment with the three women.  There was also conflicting evidence about whether Christina Young was present when Ingram was arrested.

Ingram also claims that the reported actions of several of the witnesses were inconsistent with the gravity of the situation they described, such that their testimony is inherently incredible.  He says that Ashley's mother – who apparently left her seventeen-year-old daughter alone at the Ridgeview Apartments – would not have

done so if, as Ashley claimed, Ashley felt "uncomfortable" with Ingram being in the area. And Ingram contends that Christina would not have waited outside for the police with Ingram nearby, if she were really concerned that Ingram had a gun and was looking for her. Finally, Ingram questions Dean's credibility, highlighting Dean's motivation to avoid a gun charge in the aftermath of a recent conviction for a burglary offense.

These challenges to credibility do not warrant overturning the jury's verdict. "Attacks on the sufficiency of the evidence that call upon this court to scrutinize the credibility of witnesses are generally not an appropriate ground for reversal." *United States v. McKay*, 431 F.3d 1085, 1094 (8th Cir. 2005), *cert. denied*, 126 S. Ct. 2345 *and* 127 S. Ct. 46 (2006). To prove that Ingram knowingly possessed a firearm, the government produced two women who said they had seen Ingram wrap a handgun in a large white t-shirt and put it in a truck bed. Two police officers testified that they found the gun in the truck, wrapped in an extra large t-shirt that was likely to fit Ingram, who was a six-foot, two-inch, 210-pound man. Dean and Angel testified that Ingram possessed a handgun earlier in the day, and there was dramatic testimony about Ingram brandishing the weapon and threatening to kill Dean because he would not help him commit a robbery. Angel testified that she saw Ingram loading the gun in the parking lot and that he threatened to kill her if she "snitched." In short, the jury heard from four witnesses who claimed to have seen Ingram possess a handgun on August 21, 2005, and from two police officers who found the gun where the eye-witnesses said Ingram had concealed it. The jury reasonably could believe that Ingram did knowingly possess the firearm, despite the inconsistencies in testimony that Ingram identifies. Ingram's allegations of factual inconsistencies, illogical behavior, and motivations to lie may have been useful fodder for cross-examination and closing argument, but they are not nearly compelling enough to establish that no reasonable jury could have found him guilty.

Ingram next argues that he should have been allowed to introduce videotaped interviews to impeach certain witnesses for the prosecution. We review the district court's evidentiary determinations for an abuse of discretion. *United States v. Buffalo*, 358 F.3d 519, 521 (8th Cir. 2004). The videotapes at issue were made by law enforcement on the day after Ingram's arrest. Ingram claims that they are the best evidence of what the witnesses actually saw, as they record statements made before the witnesses had an opportunity to "polish" their stories and potentially forget details of what occurred. Specifically, for example, he points to Zimmerman's trial testimony, and argues that she minimized her initial evasiveness when responding to investigators' questions regarding the identity of "Daniel." He contends that the videotaped interviews should have been admitted as impeachment material under the residual exception to the rule prohibiting hearsay. *See* Fed. R. Evid. 807.

We have observed that "Congress intended the residual hearsay exception to be used very rarely, and only in exceptional circumstances." *United States v. Peneaux*, 432 F.3d 882, 893 (8th Cir. 2005) (internal quotation omitted), *cert. denied*, 127 S. Ct. 42 (2006). As an exception to the prohibition on hearsay, Rule 807 applies only to evidence that is offered for the truth of the matter asserted. *See* Fed. R. Evid. 801(c). Ingram's contention, however, is that the district court should have admitted "video clips" as *impeachment* evidence. Extrinsic evidence of a witness's prior statement admitted merely to impeach the credibility of a witness's in-court testimony is governed by Federal Rule of Evidence 613, not Rule 807.

In any event, we conclude that the district court was well within its discretion to exclude the videotapes. Ingram was allowed wide latitude in questioning the investigator about the videotaped interviews. He successfully brought out inconsistencies in Angel's memory of what Ingram had been wearing and what kind of gun he used, the fact that Angel could not see well at the time because she was not wearing her glasses, and Zimmerman's evasiveness on the identity of "Daniel." Ingram has failed to identify any evidence from the videotapes that he was unable to

put before the jury through his examination of the investigator or cross-examination of the witnesses who had been interviewed on videotape. Given his opportunity to present the evidence through these avenues, we conclude that the district court did not otherwise abuse its discretion.

Ingram's final two contentions relate to his sentence. First, he argues that his prior conviction for a walkaway escape from a community work center does not qualify as a "violent felony" under the Armed Career Criminal Act (ACCA), 18 U.S.C. § 924(e). The ACCA mandates a minimum sentence of fifteen years' imprisonment for a felon in possession of a firearm who has sustained three prior convictions for a violent felony or a serious drug offense. It is undisputed that Ingram had sustained at least two. If his walkaway escape qualifies as a third, then he was properly classified as an armed career criminal.

Our circuit precedent, which is binding on this panel, holds that a walkaway escape does constitute a violent felony for purposes of the ACCA. *United States v. Abernathy*, 277 F.3d 1048, 1051 (8th Cir. 2002). The Supreme Court recently expounded on the meaning of "violent felony," declaring that the "proper inquiry is whether the conduct encompassed by the elements of the offense, in the ordinary case, presents a serious potential risk of injury to another." *James v. United States*, 127 S. Ct. 1586, 1597 (2007). Others have questioned whether there is adequate grounding for the assumption in prevailing case law that the "ordinary" escape presents a serious risk of injury. It has been suggested that more data are required to assess properly whether most escape convictions are of the "walkaway" or "failure to return to confinement" variety and, if so, whether the ordinary violation really presents the sort of risk contemplated by § 924(e). *United States v. Chambers*, 473 F.3d 724, 726-27 (7th Cir. 2007), *petition for cert. filed*, No. 06-11206 (U.S. May 8, 2007). As things stand, however, our case law dictates the conclusion that Ingram had sustained three prior qualifying convictions, and the district court properly classified him as an armed career criminal.

Finally, Ingram disputes the district court's finding that he possessed the firearm in connection with another felony offense. This finding resulted in a one-level adjustment of Ingram's offense level under the advisory sentencing guidelines, *see* USSG § 4B1.4(b)(3)(A); PSR ¶ 24, and an increase in his criminal history category from V to VI. *See* USSG § 4B1.4(c)(2); PSR ¶ 33. We review the district court's application of the sentencing guidelines *de novo* and its factual findings for clear error. *United States v. Bell*, 411 F.3d 960, 965 (8th Cir.), *cert. denied*, 546 U.S. 957 (2005).

Missouri law makes it a felony knowingly to "[e]xhibit[], in the presence of one or more persons, any weapon readily capable of lethal use in an angry or threatening manner." Mo. Rev. Stat. § 571.030.1(4). Missouri courts have held that whether a weapon was exhibited in a "threatening" manner is an objective determination, and that the statute may be violated even where a firearm is unloaded or where the exhibition is unaccompanied by an express verbal threat. *Bell*, 411 F.3d at 965 (collecting cases). In this case, the court heard testimony that Ingram was upset with Dean over his refusal to participate in a robbery. There was evidence that he threatened to kill Dean, lifted his shirt exposing his handgun, and shortly thereafter pointed the gun at Dean's apartment window. This testimony was sufficient to support the district court's conclusion that Ingram exhibited a weapon capable of lethal use in a threatening manner, and that Ingram thus possessed the firearm in connection with a violation of section 571.030.1(4), another felony offense.

\* \* \*

For the foregoing reasons, the judgment of the district court is affirmed.

_____